UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Please Touch Museum, | : | Case No. 15-16558 (JKF) |
| | : | |
| Debtor. | : | |
| | : | |

**DECLARATION OF LYNN McMASTER
IN SUPPORT OF FIRST DAY MOTIONS**

I, Lynn McMaster, hereby declare under penalty of perjury:

1. I am the President and Chief Executive Officer of Please Touch Museum (the "Museum" or the "Debtor"), a Pennsylvania non-profit corporation and the debtor and debtor-in-possession in the above-captioned chapter 11 case. In this capacity, I am generally familiar with the Debtor's day-to-day operations, organization, financial affairs, and books and records.

2. On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition with the Court under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"). The Debtor is operating its organization and managing its property as Debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in this chapter 11 case, and no official committees have been appointed or designated.

3. To enable the Debtor to minimize the adverse effects of the commencement of this chapter 11 case, the Debtor has requested various types of relief in its "first day" motions and applications (each, a "First Day Motion" and collectively, the "First Day Motions"). The First Day Motions seek relief intended to allow the Debtor to transition into chapter 11 and minimize disruption of its operations, thereby preserving and maximizing the value of the

118297479_13

Debtor's estate. I am familiar with the contents of each First Day Motion (including the exhibits and schedules thereto), and I believe that the relief sought in each First Day Motion: (a) is necessary to enable the Debtor to operate in chapter 11 with minimal disruption or loss of productivity and value; (b) constitutes a critical element to achieving a successful reorganization of the Debtor; and (c) best serves the Debtor's estate and creditors' interests.

4. Except as otherwise indicated, all facts set forth herein are based upon my personal knowledge of the Debtor's operations and finances, information learned from my review of relevant documents, and information supplied to me by other members of the Debtor's management and the Debtor's advisors. I am authorized to submit this Declaration on behalf of the Debtor, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

5. Part I of this Declaration describes the Debtor's operations, its corporate and debt structure and the circumstances surrounding the commencement of this chapter 11 case. Part II sets forth the relevant facts in support of each of the First Day Motions.

**I.     BACKGROUND**

    **A.     The Debtor's Corporate Structure**

6. The Debtor is a Pennsylvania non-profit organization which operates the Please Touch Museum, a children's museum located at Memorial Hall in the Fairmount Park section of Philadelphia. The address of the Museum is 4231 Avenue of the Republic, Philadelphia, PA 19131. The Debtor does not have any affiliates. Almost all of the Debtor's operations are conducted at the Memorial Hall location, but the Museum also provides certain educational services to the community in other locations.[1] The Debtor has no shareholders or partners.

---

[1] The Debtor also has a display at Philadelphia International Airport. No operations are conducted at Philadelphia International Airport.

B.  **Overview and Nature of Debtor's Operations**

7. Since 1976, Please Touch Museum has been the children's museum of Philadelphia. It is an internationally acclaimed museum, the first in the nation designed specifically for families with children seven and younger. It has grown into one of the best children's museums in the country and its programs for underserved families in the region have been nationally recognized. Please Touch Museum has a long history of providing innovative learning experiences and resources that put young children at the center and help support the development of the youngest members of our community, with a mission to enrich the lives of children by creating learning opportunities through play.

8. The Museum is housed in Memorial Hall, which is owned by the City of Philadelphia and leased to the Debtor under a lease agreement dated February 10, 2005 (the "Memorial Hall Lease"). The Memorial Hall Lease is for an initial term expiring forty five years from November 1, 2005, and there is an automatic renewal option for an additional thirty five years, provided that the Museum is not in default. The Memorial Hall Lease provides for nominal rental payments to the City of Philadelphia of $1 for the initial term and $1 for the extension term. The Debtor is required under the terms of the Memorial Hall Lease to, inter alia, (a) admit to the Museum free of charge all children in pre-kindergarten, kindergarten, and first grade who visit the Museum on prescheduled trips sponsored by Philadelphia schools; (b) fund into a Trust controlled by the City of Philadelphia capital repairs and replacements in a minimum amount of $1.5 million every ten years; and (c) perform certain other maintenance obligations.

9. Sally W. Stetson is the Chair of the Board of Directors, and has served in this capacity for approximately four years. I serve as President and Chief Executive Officer, which position I assumed in January 2014. Together, Sally W. Stetson and I lead the Museum.

10. I joined the Museum in 2012 as the Executive Vice President. Previously, I served in a number of critical roles with the Canadian Museum of History (formerly known as the Canadian Museum of Civilization), most specifically with its affiliate museum, the Canadian Children's Museum. For over twenty-five years, I have been a museum administrator and was one of the leading figures in shaping the then-nascent Canadian Children's Museum into a nationally known and respected entity.

11. Michael Armento serves as Chief Financial Officer for the Debtor.

12. In a typical year, about 75-80% of the Debtor's operating needs are met with earned income (ticket sales, memberships, fees from special events, and other receipts), 8-12% of operating needs are met with grants and contributions, and the remainder has been met with earnings on the Museum Fund. The Museum has not drawn on its endowment or on the proceeds of the endowment in 8 years.

13. The Museum has worked to aggressively reduce its operating expenses over the past two years. Annual expenses are approximately $8.2 million. In the past 12 months, payroll, related taxes and benefits have been about $4.4 million, or 53% of operating expenses. Utilities, insurance and maintenance make up another $1.9 million or 24%. The remaining $1.9 million of expense consists of education, programming and exhibits, expenses related to the Museum's store, marketing, development and administration.

14. The Debtor's fiscal year runs from October 1 to September 30.

15. The Debtor's employees are all non-union employees.

**C.    The Debtor's Debt Structure**

16. Pursuant to a Trust Indenture dated as of November 1, 2006, the Philadelphia Authority for Industrial Development issued $60 million in aggregate principal amount of its Revenue Bonds relating to the Please Touch Museum Project (the "Bonds").

17. The Memorial Hall Lease prohibits the Museum from granting a mortgage lien on its leasehold interest. The Museum has, however, generally granted a security interest in the Museum's self-generated revenues and unrestricted contributions and pledges and its furnishings, equipment and exhibits located within the Memorial Hall facility, with the exception of certain property including items loaned to the Museum.

18. The Debt Service requirements escalate over a 30 year period under the terms of the Bonds from an interest only payment of $2,497,805 for the fiscal year ending September 30, 2007 to a total payment of $5,651,925 for the fiscal year ending September 30, 2036. For the fiscal year ending September 30, 2015, the terms of the Bonds require a principal payment of $770,000 and interest payment of $2,960,025 for a total of $3,730,025.

D.    **Events Leading to the Commencement of the Chapter 11 Cases**

19. Prior to 2008, the Museum was located at 210 North 21st Street in Center City Philadelphia. On or about October 18, 2008, the Museum opened its current location at Memorial Hall in Fairmount Park. The Memorial Hall location is significantly larger than the Debtor's previous location on 21st Street. The Debtor's real property at 21st Street, which it owned, was sold following the move to Memorial Hall. The proceeds from the sale of the 2lst Street building were substantially less than expected.

20. To finance its move to Memorial Hall, the Debtor incurred the Bond obligation in the original principal amount of $60 million.

21. By 2013, it became apparent to the Board that the Museum would be unable to remain current on its Bond obligation given a significant decline in revenue and the increasing debt service requirements under the terms of its Bonds.

22. Accordingly, the Board initiated discussions with representatives of the holders of the Bonds in 2013 regarding a restructuring of the Bond debt.

5

23. At the same time, the Museum undertook an expense reduction program and achieved a significant reduction in operating expenses.

24. The Debtor has continued for a period of approximately two years to attempt to reach agreement regarding a restructuring of the Bond debt, and these efforts have resulted in the parties entering into a term sheet regarding a settlement of the bond obligations, which is described below.

25. The burden of the Bond obligation has proven to be an impediment to the Debtor's ability to raise funds, as potential donors are reluctant to donate to an entity saddled with the Bond obligation.

26. Although the rent under the Memorial Hall Lease is nominal, the lease is not economical for the Debtor because the Museum must maintain a 150 year old building owned by the City of Philadelphia. As well, the Museum is responsible for property insurance. Further, the utility expenses associated with heating and cooling the Memorial Hall location are high as a result of the age and condition of the property.

27. Accordingly, the Debtor seeks to reduce the expenses associated with operation under the Memorial Hall Lease by restructuring that lease.

28. As a result of the Debtor's declining operating revenues (because of the inability to reinvest in exhibits, marketing, etc.), declining donations (because of the inability to repay the Bond debt), and huge maintenance expenses arising from the age of the building and lease requirements, the Debtor was unable to keep current on the Bond payments, and the Debtor defaulted on the Bonds in 2014.

### E. Desired outcomes for Chapter 11 process

29. Due to the Debtor's lack of liquidity and the other issues listed above, the Debtor has made the difficult decision to file for chapter 11 protection. The Debtor believes that this is

118297479_13

the path that will best allow it to secure the future of the Museum and ensure that it continues to serve the community for many more years to come.

30. To that end, the Debtor seeks in the chapter 11 process to achieve relief from bond obligations, other debt and lease obligations through a court-approved plan and to thereby attract donor support.

31. Just prior to the filing of its bankruptcy petition, the Debtor entered into a term sheet with the Indenture Trustee for the Bonds as well as the ad hoc committee of holders of the Bonds regarding a settlement. The settlement provides for total payment to the holders of the Bonds of $8,250,000 plus the remaining value of trustee held funds. As provided in the term sheet, the Debtor transferred $2.5 million to the trustee for the Bonds just prior to the bankruptcy filing.

## II.   MOTIONS FILED ON THE PETITION DATE

### A.   Application of the Debtor Pursuant to Section 327(a) of the Bankruptcy Code for Authority to Employ Dilworth Paxson LLP as Counsel for the Debtor (the "Dilworth Retention Application")

32. By the Dilworth Retention Application, the Debtor seeks to retain Dilworth Paxson LLP ("Dilworth") as counsel pursuant to section 327(a) of the Bankruptcy Code because Dilworth has extensive experience and knowledge in the field of debtor's and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code. Dilworth possesses extensive expertise, experience, and knowledge practicing before bankruptcy courts in Pennsylvania.

33. In preparing for its representation of the Debtor in this case, Dilworth has become familiar with the Debtor's businesses and affairs and many of the potential legal issues which may arise in the context of this Chapter 11 Case.

34. The Debtor believes that the employment of Dilworth is appropriate and necessary to enable the Debtor to faithfully execute its duties as Debtor and Debtor-in-possession, and to implement the restructuring and reorganization of the Debtor. Accordingly, the Debtor believes that Dilworth is both well-qualified and uniquely able to represent the Debtor in the Chapter 11 Case in an efficient and timely manner.

35. The Debtor does not seek an expedited hearing with respect to the Dilworth Retention Motion or other professional retention motions.

**B.    Application of the Debtor for Authority to Employ Eisner Amper as Financial Advisor to the Debtor (the "Eisner Amper Retention Application")**

36. By the Eisner Amper Retention Application, the Debtor seeks to retain Eisner Amper LLP as financial advisor to the Debtor. Eisner Amper is recognized for its expertise in providing financial advisory services to financially distressed companies, including advising debtors, creditors and other constituents in Chapter 11 proceedings in numerous cases.

37. Since April, 2013 EisnerAmper has been working closely with the Debtor's management and other professionals. The Debtor selected EisnerAmper as its financial advisor because of EisnerAmper's extensive experience and knowledge of the Debtor's business, operations, and financial affairs and EisnerAmper's expertise in business reorganizations under Chapter 11 of the Bankruptcy Code. Accordingly, the Debtor believes that EisnerAmper is well qualified to assist it in this Chapter 11 Case.

38. The EisnerAmper professionals involved with the Debtor's engagement are familiar with the Debtor's business, financial affairs and capital structure. Since the firm's initial retention of EisnerAmper, EisnerAmper's professionals have worked closely with the Debtor's management and other professionals to understand the Debtor's business and coordinate the necessary professional services and other vital aspects of preparing for this Chapter 11 Case.

8

118297479_13

Accordingly, the Debtor believes that EisnerAmper has developed significant relevant experience and expertise regarding the Debtor. Therefore, the Debtor submits that the retention of EisnerAmper on the terms and conditions set forth in the Eisner Amper Retention Application is necessary and appropriate, is in the best interest of the Debtor's estate and creditors, and should be granted.

        C.        **Motion of the Debtor for Entry of an Order Authorizing Retention and Compensation of Certain Professionals in the Ordinary Course of Business ("Ordinary Course Professionals Motion")**

        39.        The Debtor retains various professionals in the ordinary course of its business (each an "OCP"). The OCP's provide services in a variety of matters unrelated to this Chapter 11 Case, including public relations and marketing, philanthropy and development, human resources, and certain other consulting services. A list of the Debtor's current OCPs is attached to the Ordinary Course Professionals Motion.

        40.        As set forth in greater detail in the Ordinary Course Professionals Motion, the Debtor proposes to retain each OCP (subject to such OCP filing and serving a declaration), and pay each OCP, without formal application to the Court by any OCP, 100% of fees and disbursements to each of the OCPs retained by the Debtor after such OCP: (a) files with the Court and serves upon the Notice Parties a declaration in accordance with the OCP Procedures; and (b) submits to the Debtor, as appropriate, an invoice setting forth in reasonable detail the nature of the services rendered after the Petition Date; <u>provided</u> <u>that</u>, while this Chapter 11 Case is pending, each OCP's fees, excluding costs and disbursements, do not exceed $25,000 per month or $400,000 in total (the "OCP Cap").

        41.        The Debtor seeks authorization to continue, in its sole discretion, to retain and compensate the OCPs on a post-petition basis in accordance with the procedures for retention and compensation of OCPs set forth in the Ordinary Course Professionals Motion without the

need for each OCP to file formal applications for retention and compensation pursuant to sections 327, 328, 330 and 331 of the Bankruptcy Code.  Additionally, the Debtor seeks to reserve the right to retain additional OCPs from time to time during this case.

    **D.**    **Application of Debtor for Entry of an Order Authorizing Retention and Employment of Isdaner & Company, LLC as Tax Advisor and Auditor (the "Isdaner Retention Application")**

42.    By the Isdaner Retention Application, the Debtor requests entry of an order pursuant to sections 327(a) and 328(a) of the Bankruptcy Code authorizing the Debtor to employ and retain Isdaner as its tax advisor and auditor, to perform primarily non-bankruptcy-related services that the Debtor will require during the course of the Chapter 11 Case.

43.    Prior to the Petition Date, Isdaner provided tax, financial compilation, and audit services to the Debtor.  These services have generally related to financial processes and controls related to the Debtor's operations and preparation of annual (audit) financial statements.

44.    As a consequence, Isdaner is intimately familiar with the complex financial issues that have arisen and are likely to arise in connection with the Debtor's continued operation.  In addition, Isdaner is also intimately familiar with the financial issues that have arisen and are likely to arise in connection with performing attest work on the Debtor's books and records.

45.    Isdaner has extensive experience and expertise in tax preparation and providing attest services, which are the services that the Debtor continues to seek from Isdaner.  As such, the Debtor submits that Isdaner is well-qualified and uniquely able to provide the tax preparation and attest services sought by the Debtor on a going-forward basis.

46.    The Debtor seeks to retain Isdaner, subject to the oversight and orders of the Court, to advise the Debtor and its management with respect to the following matters:

    a.    completion of the audit of PTM's financial statements for the year ending September 30, 2015 and subsequent periods;

      b.      preparation of Form 990's for PTM for current and subsequent periods;

      c.      providing general tax and accounting services as necessary.

**E.** **Application of Debtor For An Order Authorzing Employment and Retention of Rust Consulting/Omni Bankruptcy As Notice, Claims and Solicitation Agent ("Rust Omni Retention Application")**

47. By the Rust Omni Retention Application, the Debtor seeks authority to retain Rust Omni as claims and noticing agent.

48. Rust Omni is a bankruptcy administrator that specializes in providing comprehensive chapter 11 administrative services including noticing, claims processing, balloting and other related services critical to the effective administration of chapter 11 cases. Indeed, Rust Omni has developed efficient and cost-effective methods to handle properly the voluminous mailings associated with the noticing, claims processing and balloting portions of chapter 11 cases to ensure the orderly and fair treatment of creditors, equity security holders and all parties in interest. Further, Rust Omni will work with the Clerk's Office to ensure that such methodology conforms with all of the Court's procedures, the Local Rules and the provisions of any orders entered by this Court.

49. Rust Omni has substantial experience in matters of this size and complexity and has acted as the official notice, claims and solicitation agent in many large bankruptcy cases in this circuit and other circuits nationwide.

50. Retention of Rust Omni will facilitate the efficient administration of this bankruptcy case and will relieve the Debtor and its counsel from devoting time and attention to noticing and related issues. As a result, the Debtor will incur reduced counsel fees.

F.  **Motion of the Debtor for Entry of an Order Authorizing the Debtor to Continue Insurance Coverage Entered into Pre-Petition and Honor Obligations Related Thereto (the "Insurance Motion")**

51. In connection with the operation and management of its organization, the Debtor maintains numerous insurance policies, providing coverage for, among other things, general liability, property damage, automobile liability, special accident liability, commercial crime, director and officer liability, and fiduciary liability (collectively, the "Insurance Policies").

52. By the Insurance Motion, the Debtor requests authority to continue the Insurance Policies uninterrupted and pay any pre- or post-petition amounts related to the Insurance Policies to the extent that the Debtor determines, in its discretion, that payment is necessary or appropriate.

G.  **Motion for Entry of Interim and Final Orders Determining Adequate Assurance of Payment for Future Utility Services (the "Utility Motion")**

53. In connection with the operation of its organization, the Debtor obtains electric, water, telephone, internet and other similar utility services provided by a number of utility companies (the "Utility Providers"). The Utility Providers service the Debtor's Museum facility in Philadelphia, Pennsylvania. Preserving utility services on an uninterrupted basis is essential to the Debtor's ongoing operations and, therefore, to the success of its reorganization. Indeed, any interruption of utility services, even for a brief period of time, would disrupt the Debtor's ability to run the Museum, thereby negatively impacting the Debtor's membership, donors, customers, revenues, and profits. Such a result could seriously jeopardize the Debtor's reorganization efforts and, ultimately, its operation and creditor recoveries. It is, therefore, critical that utility services continue uninterrupted during this Chapter 11 Case.

54. By the Utility Motion, the Debtor seeks the entry of interim and final orders: (a) determining that its Utility Providers have been provided with adequate assurance of payment

within the meaning of section 366 of the Bankruptcy Code; (b) approving the Debtor's proposed offer of adequate assurance and procedures whereby the Utility Providers may request additional or different adequate assurance; (c) prohibiting the Utility Providers from altering, refusing, or discontinuing services on account of prepetition amounts outstanding and on account of any perceived inadequacy of the Debtor's proposed adequate assurance; (d) establishing procedures for the Utility Providers to object to the Debtor's proposed adequate assurance procedures; and (e) determining that the Debtor is not required to provide any additional adequate assurance, beyond what is proposed by the Utility Motion.

55.  Because the Debtor has kept current on the payment of utility bills, a deposit equal to two weeks of average service is adequate.

**H.  Motion for Entry of an Order Authorizing the Debtor to Maintain and Administer Customer Programs and Honor Certain Pre-Petition Obligations Related Thereto (the "Customer Programs Motion")**

56.  To maintain its market share and encourage use of the Museum, the Debtor has developed a number of programs to develop goodwill with its customers and members. The Debtor believes its customer programs have been successful business strategies and such programs play a critical role in the purchasing decisions of customers. As a result of the customer programs, the Debtor has established greater loyalty among its members and donors.

57.  The customer programs, which the Debtor implements and modifies from time to time in the ordinary course of business, can generally be categorized as follows: (A) Membership Programs, (B) Group Sales, (C) Gift Certificates, (D) the Philadelphia City Pass Program, and (E) Birthday Parties and Special Events.

58.  By this Motion, the Debtor seeks entry of an order authorizing it, in its sole discretion, to (a) honor certain outstanding obligations (including, without limitation, memberships, consumer deposits, discounts, special pricing or payment arrangements) earned by

118297479_13

and owing to its members and other customers under the Customer Programs, and (b) make payments to its customers in the ordinary course of business in satisfaction of certain accrued, pre-petition obligations incurred by the Debtor on account of its Customer Programs, in an amount not to exceed $10,000 in the aggregate (collectively, the "<u>Customer Program Obligations</u>"). Additionally, the Debtor seeks authority to maintain and administer its Customer Programs in the ordinary course of business and in a manner consistent with past practice.

> **I.    Motion for an Order (A) Authorizing the Debtor to Pay Certain Pre-petition (I) Wages, Salaries, Bonuses, and Other Compensation, (II) Reimbursable Employee Expenses, and (III) Employee Medical and Similar Benefits; (B) Confirming that the Debtor May Continue Pre-petition Employee Programs in the Ordinary Course of Business; and (C) Directing Banks and Other Financial Institutions to Honor all Related Checks and Electronic Payment Requests (the "Wage Motion")**

59.     To minimize the personal hardship that the Debtor's employees would suffer if pre-petition employee-related obligations are not paid when due or as expected, and to maintain morale and stability in the Debtor's workforce during this critical time, by the Wages Motion, the Debtor seeks authority to pay and honor, in its sole discretion, certain pre-petition claims for, among other items: wages, salaries, commissions, bonuses and other compensation, expense reimbursement, federal and state withholding taxes and other amounts withheld (including, garnishments, Employees' share of insurance premiums, taxes, and 403(b) contributions), health benefits, insurance benefits, workers' compensation benefits, life insurance, PTO, long-term and short-term disability coverage, floating holidays and all other benefits that the Debtor has historically provided in the ordinary course of business and to pay all costs incident to the foregoing.

60.     Additionally, the Debtor requests confirmation that the Debtor may, in its sole discretion, continue its pre-petition employee incentive programs in the ordinary course of business. In an abundance of caution, the Debtor requests the right to modify, change, and

14

discontinue any of its employee compensation, programs, policies and benefits, and to implement new programs, policies and benefits in the ordinary course of business during this chapter 11 case in its sole discretion without the need for further Court approval.

61. There are no prepetition wage claims over the priority limit of 11 U.S.C. § 507(a)(4) (currently $12,475).

    **J.** **Motion for Entry of an Order: Authorizing the Debtor to (I) Continue Cash Management System, (II) Maintain Existing Bank Accounts and Business Forms and (III) Maintain Existing Investment Practices (the "Cash Management Motion")**

62. By the Cash Management Motion, the Debtor seeks entry of an order authorizing the Debtor to (a) continue its Cash Management System, (b) maintain its existing Bank Accounts and Business Forms and (c) maintain its existing Investment Practices. The Debtor also requests that the Court authorize the Debtor's banks to continue to maintain, service and administer the Bank Accounts. The Debtor requests the Court authorize the banks to debit the Bank Accounts in the ordinary course of business on account of: (a) all checks drawn on the Bank Accounts and which are cashed at the banks' counters or exchanged for cashier's checks by the payees thereof prior to the Petition Date, (b) all checks or other items deposited in one of the Debtor's accounts with the banks prior to the Petition Date which have been dishonored or returned unpaid for any reason, together with any fees and costs in connection therewith, to the same extent that the Debtor was responsible for such items prior to the Petition Date and (c) all undisputed prepetition amounts outstanding as of the date hereof, if any, owed to the banks as service charges for the maintenance of the Cash Management System.

63. The use of the Cash Management System is essential to enable the Debtor to control and monitor corporate funds, ensure cash availability and liquidity, reduce administrative expenses by facilitating the movement of funds and enhance the development of accurate

15

account balance and presentment information. These controls are crucial given the significant volume of cash transactions managed through the Cash Management System.

### K.  Motion for an Order Establishing Certain Notice, Case Management, and Administrative Procedures (the "Case Management Motion")

64. By the Case Management Motion, the Debtor seeks entry of an order establishing certain notice, case management, and administrative procedures (the "Case Management Procedures"), which include the following: (a) limiting notice to the Debtor's Members (totaling approximately 9,000) so that the Members receive notice of the commencement of the case, but no further notices; (b) directing that matters requiring notice under Bankruptcy Rule 2002(a)(2)–(6) will be served upon a specified list of parties and those creditors who file with the Court a request that they receive such notices pursuant to Bankruptcy Rule 2002; (b) allowing electronic service of all documents (except complaints and summonses); and (c) directing that all matters be heard at monthly omnibus hearings to be scheduled in advance by the Court. The Debtor further requests that the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules apply to this Chapter 11 Case to the extent that they do not conflict with the Case Management Procedures.

65. Effective and streamlined case management procedures are necessary to keep administrative expenses to a minimum.

### L.  Motion for an Order (A) Authorizing but Not Directing the Debtor to Remit and Pay Certain Sales Taxes and (B) Authorizing And Directing Banks and Other Financial Institutions to Honor Related Checks and Electronic Payments (the "Taxes Motion")

66. In the ordinary course of its business, the Debtor collects and remits sales taxes incurred in connection with the Museum's operations and sales (the "Taxes"). Generally, sales taxes collected from customers are remitted to appropriate taxing Authorities in the month following collection.

16

67. If the Debtor does not pay the Taxes, the respective Authorities may take actions that could have a wide-ranging and adverse effect on the Debtor's operation as a whole. Accordingly, by the Taxes Motion, the Debtor seeks authority, in its sole discretion, to pay Taxes without regard to whether such obligations accrued or arose before or after the Petition Date.

68. The Debtor believes that payment of the Taxes is appropriate in this Chapter 11 Case, where the outstanding tax liabilities are for trust fund taxes that the Debtor has collected and holds in trust for the benefit of the Authorities. These funds do not constitute property of the estate and could not otherwise be used by the Museum. The Debtor estimates that, as of the Petition Date, it owes $5,000 with respect to sales taxes incurred prior to the Petition Date.

**M.  Motion for Entry of an Order Extending the Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statement of Financial Affairs ("Extension Motion")**

69. Pursuant to the Extension Motion, the Debtor seeks the entry of an order extending the time to file its schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, statement of financial affairs and related documents required by the Bankruptcy Code and the Local Bankruptcy Rules for the Eastern District of Pennsylvania (the "Schedules and Statements").

70. The Debtor has begun, but has not yet finished, compiling the information that will be required in order to complete the Schedules and Statements. Due to the complexity of the Debtor's business, the Debtor seeks an initial extension of thirty-one (31) days in order to prepare its Schedules and Statements.

**N.  Motion of Debtor Please Touch Museum for Order Authorizing Use of Cash Collateral (the "Cash Collateral Motion")**

71. The Debtor has an urgent need for the immediate use of cash collateral following the filing of the Petition. Indeed, access to the use of pre-petition cash collateral in the form of

pre-petition accounts receivable and pre-petition gross receipts is essential to ensure that the Debtor can fund its immediate post-petition operating requirements and other financial obligations. Absent the ability to use cash collateral, the Debtor will not be able to pay wages, insurance, and other critical expenses incident to the Museum's operation.

72. The Debtor believes that the expenses reflected on the Initial Budget submitted with the Cash Collateral Motion (the "Initial Budget") represent the minimum reasonable and necessary business expenses that must be paid in order for the Museum to remain in operation and continue serving its important community function. Absent the immediate and continued funding of these essential operating and administrative costs, the Debtor would suffer irreparable harm at the very outset of this case.

73. Without approval of the use of cash collateral, the Debtor will not be able to continue operating, will not be able to undertake the aggressive fundraising campaign that it will need to operate through this restructuring, and will instead be forced to wind down its operations rather than resuscitate them. Uninterrupted access to working capital is critical to maintain the Museum's employee workforce, infrastructure, status as a community treasure and cultural resource, and the preservation of estate assets for the benefit of all creditors and parties in interest.

74. Accordingly, by the Cash Collateral Motion, the Debtor seeks authority to use cash collateral consistent with the Initial Budget.

118297479_13

Dated: September 11, 2015         PLEASE TOUCH MUSEUM

                                  By: _____
                                       Lynn McMaster,
                                       President and CEO